**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DELPHINE TAYLOR | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : CASE NO. 17-123 RBW |
| | : |
| WASHINGTON METROPOLITAN | : |
| AREA TRANSIT AUTHORITY, et al. | : |
| | : |
| Defendants. | : |

**MOTION FOR SUMMARY JUDGMENT BY JEREMY GUIDA**

Comes now the Defendant Jeremy Guida, by and through undersigned counsel, and moves for summary judgment as a matter of law. In December 27, 2017, Plaintiff Delphine Taylor filed a Complaint in the Superior Court of the District of Columbia against WMATA and two Metro Transit Police Department ("MTPD") officers, Jeremy Guida and Christopher Young, alleging claims arising out of her arrest at Gallery Place on January 27, 2016, for fare evasion. (Complaint, ECF #1-2). On January 18, 2017, Defendants removed the case to the United States District Court for the District of Columbia. (Notice of Removal, ECF #1-1).

Plaintiff's Complaint arises out of her arrest for fare evasion at WMATA's Gallery Place Metrorail station. (Complaint, ECF #1-2). MTPD Officer Jeremy Guida testified that he arrested Plaintiff after watching her exit the fare gates at Gallery Place, very close behind another passenger who was also exiting; Plaintiff admits that she failed to pay her fare when entering and exiting the station that day. (SMF ¶¶ 2, 39). Plaintiff claims that after her arrest that she was handcuffed too tightly by two MTPD officers (Guida and Young), who refused to loosen the handcuffs. *(Complaint at ¶¶ 9, 12, 16 ECF #1-2).*

Count One of Plaintiff's Complaint asserts negligence against WMATA and the two MTPD officers for allegedly "over-tightening" her handcuffs and "refusing to loosen them."

Plaintiff relies of the same allegations, using the same allegations of "over-tightened handcuffs" that the officers "refus[ed] to loosen" for both the assault and battery claim of Count II and the civil rights claim of excessive force of Count III. (*Id.*). By order dated August 16, 2017, this Court dismissed all claims against WMATA (Order, ECF #14). By stipulation of the parties on June 22, 2018, this Court dismissed all counts against Defendant Officer Christopher Young. (Order, ECF #24).

The three counts remain as to the defendant, Jeremy Guida and all three counts must be dismissed as a matter of law.[1] Plaintiff's negligence count must be dismissed because Plaintiff: a) has pled an intentional tort, masquerading as a negligence claim, s*ee Dist. of Columbia v. Chinn,* 839 A.2d 701, 07 (D.C.2003) and, b) has failed to a produce admissible expert testimony to support her claim of "negligent handcuffing." Plaintiff's designated expert, Randy Foster, has failed to provide admissible evidence of a national standard of care because his methodology is unreliable under Federal Rule of Evidence 702 and must be stricken pursuant to this Court's gatekeeping function. *See Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993). Count Two asserts the same allegations of "over-tightening" and "refusing to loosen the handcuffs" for the intentional tort claim of assault and battery. (Complaint at ¶ 12, ECF #1-2). However, police officers acting under color of law have a privileged right to place handcuffs on an arrestee; any act of handcuffing is a battery by its very definition for which officers are clothed in privilege when arresting, as long as their acts are objectively reasonable. *See Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C.1993). Plaintiff has failed to produce admissible that Officer Guida's actions were not objectively reasonable, and in fact, lacks

---

1 Jeremy Guida held the rank of officer at the time of this incident; he has since been promoted to Sergeant. He referred to as "Officer Guida" for throughout this motion for consistency and clarity.

knowledge of any actions by Officer Guida. (SMF ¶¶ 14-15). Last, Plaintiff's claims for excessive force must be also dismissed as a matter of law as Officer Guida enjoys qualified immunity for his actions and Plaintiff's claims, as a matter of law, cannot survive a qualified immunity analysis.

Wherefore, for the reasons stated as was as provided in more detail herein, Defendant Guida moves for summary judgment as to all three counts and that Plaintiff's Complaint be dismissed with prejudice.

Respectfully Submitted,

WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY

/s/ Janice L. Cole
Janice L. Cole #440351
Chief Counsel - MTPD
WMATA
600 5th St., N.W.
Washington, D.C. 20001
(202) 962-2543
(202) 962-2550 (facsimile)

 /s/ Neal M. Janey, Jr._____
Neal M. Janey, Jr., Bar No.: 995449
Associate General Counsel
600 Fifth Street, N.W.
Washington, D.C. 20001
Telephone: (202) 962-1067
Facsimile: (202) 962-2550
E-mail: nmjaney@wmata.com

**CERTIFICATE OF SERVICE**

I certify that a true copy of the foregoing Motion for Summary Judgment by Jeremy Guida was served by the court's electronic filing system on this 4th day of September, to:

Geoffrey D. Allen
1730 Rhode Island Avenue, NW
Suite 206
Washington, DC  20036
(202) 778-1167 (o)
(202) 659-9536 (f)
geoffreyallen@verizon.net


/s/ Janice L. Cole
Janice L. Cole

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**


DELPHINE TAYLOR              **:**
                                **:**
      **Plaintiff,**           **:**
                                **:**
v.                            **: CASE NO. 17-123 RBW**
                                **:**
WASHINGTON METROPOLITAN     **:**
AREA TRANSIT AUTHORITY, et al.    **:**
                                **:**
      **Defendants.**       **:**


## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JDUGMENT BY JEREMY GUIDA

      Comes now the remaining Defendant, Jeremy Guida, by and through undersigned counsel, and moves to for summary judgment. In support of the motion, the Defendant submits this Memorandum of Law.

### FACTUAL BACKGROUND

      Plaintiff filed a Complaint against WMATA and two MTPD officers, arising out of her arrest at Gallery Place, on January 27, 2016, for fare evasion. (Complaint, ECF #1-2). In her Complaint, she alleges that she was handcuffed too tightly after her arrest and the handcuffs were not loosened, and as a result, she incurred wrist pain and nerve damage. (*Id*). In Count One of her Complaint, Plaintiff asserts that WMATA and the two MTPD officers were "negligent" in over-tightening the handcuffs and refusing to loosen them. (*Id*.). Plaintiff asserts the same, too-tight handcuffing and failure to loosen the cuffs, as the factual predicate for her assault and battery claim (Count II), as well as her constitutional claim of excessive force in violation of the Fourth Amendment (Count III). WMATA filed a

motion to dismiss and the motion was granted as to all counts on August 16, 2017. (ECF #14). Defendant Officer Christopher Young, by stipulation of the parties, was dismissed on June 22, 2018. (ECF #24). All three counts remain as to Jeremy Guida.

**<u>FACTS</u>**

On January 27, 2016, at approximately 6:26 p.m., Plaintiff was a WMATA rail passenger and exited through fare gates at WMATA's Gallery Place Metro Station. (Statement of Material Facts Not in Dispute ("SMF") ¶ 1). Plaintiff admits that she did not use her fare card to exit through the fare gate; she also admits that she did not use her fare card to enter WMATA's rail system. (SMF ¶ 2). Plaintiff gives no reason as to why she didn't use her fare card to enter or exit the system that day. (SMF ¶ 3). Plaintiff describes that an MTPD officer saw Plaintiff go through the gate without paying her fare and "came out of nowhere," telling her, "hey, come back through the gate." (SMF ¶ 4). She understood the reason that the officer asked her to turn around and to come back through the fare gates was because she didn't pay and that she had been caught. (SMF ¶ 5). The officer told her she was being arrested for failure to pay a fare. (SMF ¶ 6). That same officer handcuffed her. (SMF ¶ 7). The officer took her upstairs and there were around three other officers there. (SMF ¶ 8). Plaintiff does not know who the officer was that saw her going through the fare gate without paying her fare. (SMF ¶ 9). Plaintiff does not know who the officer was because she didn't get their names, the officers all look alike; and they all have the same blue uniform. (SMF ¶ 10). Plaintiff states that she was in with the officers during the course of this interaction for approximately fifteen minutes. (SMF ¶ 11). Plaintiff identified Officer Jeremy Guida during her deposition as one of the officers that was present at the time of her arrest. (SMF ¶ 12). Plaintiff does not know what role Officer Guida played in her arrest.

(SMF ¶ 13). Officer Guida is not the officer who initially approached Plaintiff to call her back through the fare gates. (SMF ¶ 14). The officer who initially approached Plaintiff has red hair. (SMF ¶ 15). Officer Guida has dark hair, and "looks Spanish." (SMF ¶ 16). It was an officer with red hair, not Officer Guida, who was hostile with Plaintiff by arguing with her. (SMF ¶ 17). Plaintiff does not know how or why Officers Young and Guida were named in her suit. (SMF ¶ 18). Plaintiff does not know what Officer Guida did or what his role he played in arresting and handcuffing her. (SMF ¶¶ 14-15).

### **STANDARD OF REVIEW**

Summary judgment is appropriate whenever the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56. Once the moving party makes the initial showing that no issue exists as to any material fact, the burden shifts to the opposing party to demonstrate the existence of a material factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Plaintiff, as the non-moving party, is required to provide evidence that would permit a reasonable jury to find in his favor. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987). In ruling upon a summary judgment motion, all reasonable inferences that may be drawn from the facts in the record must be drawn in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The inferences, however, must be reasonable, and the non-moving party can only defeat a motion for summary judgment by responding with some factual showing that creates a genuine issue of material fact. *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993). Mere conclusory allegations are insufficient to raise a genuine issue of material fact. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

**ARGUMENT**

I.     **PLAINTIFF'S NEGLIGENCE CLAIM AGAINST JEREMY GUIDA MUST BE DISMISSED AS A MATTER OF LAW**

The plaintiff in a negligence action bears the burden of production and proof on three issues: the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury." *Toy v. District of Columbia,* 549 A.2d 1, 6 (D.C.1988) (citations and internal quotation marks omitted).

**A.  PLAINTIFF HAS ALLEGED AN INTENTIONAL ACT FOR HER CLAIM OF NEGLIGENCE**

A negligence action must be one that is a separate and distinct claim from an intentional tort to survive summary judgment. *Brooks v. District of Columbia*, 2006 WL 3361521, at *5 (D.D.C. 2006). A court looks to a plaintiff's pleadings to determine whether there are allegations sufficient for both a negligence claim and an intentional tort. *Id.*

In the case *sub judice*, to maintain both a negligence and battery claim, Plaintiff must plead **"**at least one distinct element, involving an independent breach of a standard of care beyond that of not using excessive force in making an arrest, which may properly be analyzed and considered by the jury on its own terms apart from the intentional tort of battery and the defense of privilege." *Dist. of Columbia v. Chinn,* 839 A.2d 701, 707 (D.C. 2003).

In *Chinn*, the plaintiff alleged that officers deliberately inflicted excessive force, and by doing so, breached their duty of care. *Id.* at 711. Due to the plaintiff's failure to produce separate evidence of negligence, without the element of intention, the D.C. Court of Appeals held that his negligence claim should not have been submitted to the jury. *Id.* at 711.

Plaintiff's claim for negligence fails because she describes an intentional act. *Also see* Section II, *infra*. In every count of her Complaint, including her negligence count, Plaintiff

alleges that, MTPD officers, "*over-tighten[ed] Plaintiff's handcuffs and refus[ed] to loosen them.*" (Complaint at ¶¶ 9, 12, 16, ECF #1-2). Plaintiff dresses this alleged intentional act of refusing to loosen the handcuffs in the apparel of negligence, by tacking on the phrase that such intentional act was a failure "to comply with the national standard of care required of police officers faced with like circumstances and acted in a grossly negligent manner." (Complaint at ¶ 9, ECF #1-2)(*emphasis added*). Although Plaintiff inserts the word "negligence" into Count One, her conclusory pleadings are the kind that the D.C. Court of Appeals has held does not raise a cognizable claim of negligence. *Maddox v. Bano,* 422 A.2d 763, 764 (D.C.1980). Plaintiff's Count One, on its face, is not a negligence action, but an intentional tort, and must be dismissed as a matter of law.

### B. EVEN ASSUMING, *ARGUENDO*, THAT PLAINTIFF HAS PLED A COGNIZABLE NEGLIGENCE CLAIM, SHE HAS FAILED TO CARRY HER BURDEN OF PRODUCTION AND HAS NO ADMISSIBLE EVIDENCE ON THE NATIONAL STANDARD OF CARE

Even assuming Plaintiff has not pled an intentional tort but an actionable claim of negligence in Count One, Plaintiff's negligence claim must be dismissed as she has failed to produce admissible evidence regarding the national standard of care for the methodology by which officers must check for handcuff tightness of arrestees. Under District of Columbia law, a plaintiff in a negligence action must demonstrate three elements: that there was "a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach." *Girdler v. United States*, 923 F. Supp. 2d 168, 187-88 (D.D.C. 2013) (*quoting Simms v. District of Columbia,* 699 F.Supp.2d 217, 227 (D.D.C.2010). See also, *WMATA v. Ferguson,* 977 A.2d 375, 377 (D.C.2009). For reasons stated more fully herein, Plaintiff has failed to produce admissible evidence of the standard of care required of police officers in handcuffing arrestees and determining whether the

handcuffs are too tight.   The report and testimony of Plaintiff's 26(a)(2) liability expert, Randy

Foster, a retired U.S. Marshal,  is not reliable as required under Federal Rule of Evidence 702.

His opinion is that the national standard of care for officers checking whether handcuffs were too

tight on arrestees was predicated upon his flawed understanding of an authoritative treatise on

handcuffing, writing by a national expert on the subject, Dr. John G. Peters, Jr.  (Foster Depo. at

27:3 – 29:15).  Pursuant to his incorrect interpretation of Dr. Peters' manual, Mr. Foster opined

that Officer Guida failed to adhere to the national standard of care for checking on the tightness

of an arrestee's handcuff when he did not slip his index finger under the handcuffs to check for

tightness, but instead, moved the handcuffs back on forth on Plaintiff's wrists. (SMF ¶¶ 47-53;

Foster Report at p.7, ECF #22-1).  Dr. John G. Peters, Jr. was retained by Officer Guida (Guida

26(a)(2), ECF #23) and refutes Mr. Foster's incorrect and misleading interpretations of Dr.

Peters' manual.  (Report of Dr. John G. Peters, Jr., ECF #23-3).  Dr. Peters unequivocally opines

that a visual and physical inspection as conducted by Officer Guida does meet the standard of

care and that nothing in his manual states that doing a visual and physical inspection as Officer

Guida did, would violate the national standard of care.  Mr. Foster's methodology is unreliable

because he relies in whole on the expertise of Dr. Peters and does so incorrectly and

misleadingly, and as Dr. Peters explained, Mr. Foster lacks sufficient knowledge and experience

of his own in this area to act as an expert witness, as set forth more fully herein.  (Report of Dr.

John G. Peters, Jr., ECF #23-3)

**1. PLAINTIFF MUST PRODUCE ADMISSIBLE EXPERT TESTIMONY TO ESTABLISH THE NATIONAL STANDARD OF CARE FOR OFFICERS' HANDCUFFING OF ARRESTEES AND CHECKING FOR THE TIGHTNESS OF THE HANDCUFFS**

Expert testimony is required to establish the standard of care in negligence actions is

when "the subject in question is so distinctly related to some science, profession, or occupation

as to be beyond the ken of the average layperson." *Briggs v. Wash. Metro. Area Transit Auth.,* 481 F.3d 839, 845 (D.C.Cir.2007) (*quoting District of Columbia v. Arnold & Porter,* 756 A.2d 427, 433 (D.C.2000)) (internal quotation marks omitted). Courts must assess whether the pertinent standard of care owed by the alleged tortfeasor in the factual context presented is "within the realm of common knowledge and everyday experience" of the jurors or requires the guidance of expert testimony. *Arnold & Porter,* 756 A.2d at 433 (quoting *District of Columbia v. White,* 442 A.2d 159, 164 (D.C. 1982)). *See also Moore v. District of Columbia*, 79 F.Supp.3d 121, 143 (D.D.C., 2015).

In *Tillman v. Washington Metropolitan Area Transit Authority*, 695 A.2d 94 (D.C. 1997), the Court of Appeals explained that

> We do not believe that jurors are so familiar with the appropriate level of tightness of handcuffs and with the appropriate response of police officers to complaints by arrested individuals concerning the tightness of handcuffs that the jury here reasonably could find for the plaintiff in the absence of expert testimony or of similar evidence establishing the standard of care.

*Id.* at 97.

Under D.C. law, Plaintiff must produce expert testimony on the standard of care for any claims regarding whether the level of tightness of her cuffs and the standard of care for the methods by which officers may assess the tightness of the handcuffs. An expert's opinion will be insufficient is he or she opines as to what he or she would do under similar circumstances; it is similarly lacking if the expert simply declares that the defendant violated the national standard of care. *Briggs v. WMATA*, 481 F.3d at 846. The expert must not only articulate that a standard of care exists, but the expert must also reference the standard of care against which the defendant's actions can be measured. *Id.* Thus the expert must relate the standard of care to the practices

generally followed by other comparable facilities or to some standard nationally recognized by such units.  *Id.*

## 2. THE ADMISSIBILITY OF PLAINTIFF'S EXPERT'S OPINIONS IS APPROPRIATE FOR COURT TO DECIDE ON SUMMARY JUDGMENT

"When ruling on a motion for summary judgment, courts need only consider admissible evidence."  *Augustus v. McHugh*, 870 F.Supp.2d 167, 171 (D.D.C., 2012)(*quoting U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union Number 3,* No. 00 Civ. 4763, 2006 WL 2136249, at *5 (S.D.N.Y. Aug. 1, 2006) (*citing Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir.1997) (**"**The principles governing admissibility of evidence do not change on a motion for summary judgment.").   A district court acts appropriately when deciding questions pertaining to the admissibility of expert opinion evidence on a motion for summary judgment. *Raskin v. Wyatt Co.*, 125 F.3d at 66.

## 3. THE TRIAL JUDGE MUST EXERCISE ITS GATEKEEPING FUNCTIONS BY REQUIRING EXPERT TESTIMONY BE BOTH RELIABLE AND RELEVANT

The Supreme Court held in *Daubert v. Merrell Dow Pharmaceuticals* that the trial judge performs a "gatekeeping" function to ensure that expert testimony "both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. 579, 597 (1993). As part of that gatekeeping function, the trial judge properly screens out inadmissible expert testimony on summary judgment. *Strauss v. Credit Lyonnais, S.A.,* 925 F.Supp.2d 414, 437 (E.D.N.Y. 2013) (*citing Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir. 1997)). "This is true even if the exclusion of expert testimony would be outcome determinative." *Id.* (*citing Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 142–43 (1997).  The admissibility of expert testimony is governed by the analysis set forth in *Daubert v. Merrell Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), *General Electric Co. v.*

*Joiner*, 522 U.S. 136 (1997), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) and Fed. R. Evid. 702.

One of the ways in which a trial judge exercises a gatekeeping function is by examining the expert's qualifications. <u>McReynolds v. Sodexho Marriott Services, Inc.</u>, 349 F. Supp. 2d 30, 35 (D.D.C. 2004). In *Kumho*, the Supreme Court expanded the trial judge's gatekeeping function to cover all expert testimony, not just scientifically-based testimony. *United States v. Naegele*, 471 F. Supp. 2d 152, 156 (D.D.C. 2007).

Fed. R. Evid. 702 states, in pertinent part, that a witness qualified as an expert by knowledge, skill, experience, training or education may testify. To be qualified as an expert, a witness must be an expert in the relevant field. *See Sigma Tool & Machine v. Nagayama Electronic Industry Co., Ltd,* 2002 U.S. Dist. LEXIS 28185 at *15 (D.D.C. December 18, 2002).

If the witness has the knowledge, skill and experience to testify, the trial judge must determine whether the expert's methodology was both reliable and relevant. *In Defense of Animals v. USDA*, 587 F. Supp. 2d 178, 182 (D.D.C. 2008) (Roberts, J.) (Rule 702 requires that expert testimony be both reliable and relevant to the task at hand.)(*quoting Daubert,* 509 U.S. at 597.).

In *Marshall v. D.C. Caribbean Carnival, Inc.*, 2004 U.S. Dist. LEXIS 27545 at *16 (D.D.C. October 26, 2004), this Court reiterated the gatekeeping function of the trial court judge:

> Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to ensure that expert testimony is not only relevant, but reliable. . . . It is the province of a trial judge to act as a gatekeeper for expert testimony. (*Quoting Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).*See also Sykes v. Napolitano*, 634 F. Supp. 2d 1, 6 (D.D.C. 2009) (The trial court serves as a gatekeeper to ensure that all expert testimony is not only relevant, but reliable) (*citing Daubert,* 509 U.S. at 589).
> Further <u>in Naegele</u>, 471 F. Supp. 2d at 156, this Court observed:

> In *Daubert,* the Court charged trial judges with the responsibility of acting as

gatekeepers: to shield unreliable or irrelevant expert testimony and evidence from the jury.

On the issue of reliability, this Court must focus on the methodology employed by the expert. *See, e.g., Naegele*, 471 F. Supp. at 157 (With respect to evidentiary reliability, the Court's focus must be on the methodology . . . employed . . . .). The Court determines reliability on a case-by-case basis. *Lewis v. Booz-Allen & Hamilton, Inc.*, 150 F. Supp. 2d 81, 91-92 (D.D.C. 2001) (*citing Kumho*, 526 U.S. at 158) (in assessing the reliability of an engineering expert's testimony, the trial court may consider the *Daubert* factors to the extent relevant, which will depend upon the nature of the issue, the expert's particular expertise, and the subject of his testimony). *See also Estate of Gaither v. District of Columbia*, 2008 U.S. Dist. LEXIS 108556 at *7 (D.D.C. July 30, 2008) (Courts have the discretion to determine, before trial, whether a proposed expert's testimony is reliable in light of the facts and circumstances of the case.) (*citing Kumho,* 526 U.S. at 152, 158 (1999)). Where nonscientific evidence is offered, the *Daubert* factors often will not apply and reliability concerns may focus on personal knowledge or experience. Muldrow v. Re-Direct, Inc., 2005 U.S. Dist. LEXIS 41542 *5 (D.D.C. May 3, 2005). Expert testimony that rests solely on subjective belief or unsupported speculation is not reliable. *Id.*

Although the Court's focus must be on the expert's principles and methodology and not on his conclusions, conclusions and methodology are not entirely distinct from one another. *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. Id. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered. Id.

On the issue of relevance, this Court must determine whether the testimony is helpful to

the jury and will aid the jury in resolving a factual dispute. *Naegele*, 471 F. Supp. at 157 (*citing*

*Daubert*, 509 U.S. at 592-593).

## 4. MR. FOSTER'S OPINIONS ARE NOT RELIABLE UNDER FEDERAL RULE OF EVIDENCE 702

Mr. Foster opines his report (ECF #22-1) that Officer Guida did not "use the correct

method of applying handcuffs" in this case. (Foster Report at p.7, ECF #22-1). He identifies the

national standard of care as being found in a book by national handcuffing expert, Dr. John G.

Peters, Jr., "Tactical Handcuffing for Chain & Hinged-Style Handcuffs." (*Id.* at pp. 3, 7). Mr.

Foster also makes reference to an excerpt from a purported lesson plan from an unidentified

author allegedly from the D.C. Metropolitan Police Department ("MPD"), dated August 20,

2001. (*Id.*). According to Mr. Foster, Dr. John G. Peters, Jr.'s book sets forth the national

standard of care for a police officer to check the tightness of an arrestee's handcuffs, and

references a page from the book where he says that an officer is mandated to place the tip of the

index finger between the bracelet and the handcuff in a way as to "slip the finger under the

handcuffs on the top, bottom and sides of the wrists." (*Id.* at 7). Mr. Foster's description of this

process is confusing and is not subject to being objectively quantified:

> Q: Well, I want to talk to you about that. Because that is simply saying you
> should be able to slip the top of your index finger underneath. What amount of
> space is that? Can you define it?
> A: How much space? I don't understand your question.
> Q: Yes. Well, would you agree that there can be differences in the size of fingers,
> for example, between men and women?
> A: Yes.
> [ . . .]
> Q: So there is going to be variation, no matter what, when you talk about the tip of
> the index finger and depending on whose index finger it is. It's just the way
> humans are made. We are not all the same size, right?
> A: You know, I'm not a doctor. All I can tell you is, from my knowledge is
> different fingers are different sizes.

(Exhibit 4, Foster Deposition ("Foster Depo.") at 30:4-22).

Mr. Foster could not articulate the difference in the amount of space a fingertip test would yield compared to the amount of space there would be officer if an officer could move the handcuffs freely along the wrists. (*Id*. at 34:5-16). Not could Mr. Foster point to any studies on data on the differences between the two methods, and what benefits might be associated with one versus the other. (*Id*.). He insists that an officer failing to use the fingertip test is a breach of the national standard of care because it is his own personal experience from handcuffing people. (*Id*. at 29:14-15). That Officer Guida did check on the tightness of Plaintiff's handcuffs by physically moving them up and down on Plaintiff's wrists is of no significance to Mr. Foster, because it would still "be possible to have some movement of the bracelet along the wrist and for it [to] fail the finger test." (*Id*. at 8). Mr. Foster does not explain the factual bases for this assertion, let alone why and how stating the mere "possibility" of failure meets the standard of holding an opinion to a reasonable degree of certainty for professional law enforcement.

The genre of opinions being offered in this case fall into the "non-scientific" category, where reliability issues often arise relating to the personal knowledge and experience of the expert. *See Muldrow v. Re-Direct, Inc., supra.* The district court should "undertake a rigorous examination of the facts on which the expert relies, and how the expert applies the facts and methods to the case at hand." *Amorglanos v. Nat'l R.R. Passenger Corp*., 303 F.3d 256, 267 (2nd Cir. 2002).

As an initial matter, Mr. Foster's experience and knowledge derive primarily from a correctional-type environment, which is quite different from the tri-jurisdictional police environment in which Officer Guida is a police officer; Mr. Foster has been with the U.S. Marshal Service --minus his time in the military and Federal Air Marshals from 2003 to 2007 – from 1991 to 2013. (Foster Report, ECF 21-1 at pp 17-21 (Report of John G. Peters, Jr. at p. 5,

Section VII; ECF #23-4).  As a patrol officer of the MTPD, Officer Guida does not have the "luxury of immediate help should an arrestee begin struggling with him." *Id*.  Mr. Foster, when effecting arrests while as a U.S. Marshal would be given a warrant naming a probation violator, and serve the warrant with the assistance of either one or two other deputies (Exhibit 4, Foster Depo. at 23:18 – 25:15).  Mr. Foster always had at least one partner, and sometimes two, accompany him based upon "officer safety and the Marshal Service polices," which did not allow an officer to go out alone.  (*Id.*).

Mr. Foster unequivocally states that he is relying on Dr. Peters' description of handcuffing and checking for tightness as described in Dr. Peters' book, as well as his own personal experience, to determine the standard of care in the instant matter and whether it was violated by Officer Guida.  (Foster Report, ECF #22-2; Foster Depo. at 29:2-15).  Mr. Foster opined "to make sure that the handcuffs are not tight, you would use the method and standard of care that is written in the tactical handcuff book."  (Foster Depo. at 35:11-14).

When asked to describe what tests or studies or data he was relying on for his opinions that checking for tightness by moving the handcuffs on the wrists of arrestees would result in the handcuffs being "too tight," no matter what, Mr. Foster replies, "I have no studies or data.  But what I have done is practical experience dealing with people with tight handcuffs." (Foster Depo. at 34:5-16).  Of note, almost all of Mr. Foster's twenty years of experience has been in a correctional-type setting where the prisoners were confined already and where Mr. Foster always was accompanied by one or more officers if a prisoner became unruly.  (Peters Report at p. 9, ECF #3).

Dr. Peters' tactical handcuff book does not require, as he Mr. Foster incorrectly testified, "putting the tip of your finger" down so the handcuff "clamps" around it.  (Peters Report p. 9,

ECF #23-3; Foster Depo. at 58:16-22).

The excerpt used by Mr. Foster states, "Generally speaking, after you have applied the handcuffs, you should be able to slip the tip index finger under the handcuffs on the top, bottom and sides." Dr. Peters does not write that this is the only way to check on whether the handcuffs are tight; nor does Dr. Peters state an officer must stick his or her index finger under the handcuff. Dr. Peters refutes Mr. Foster's assertion that an officer should place one's fingertip on a suspect's wrist as it subjects the officer to risk of injury with a moving or struggling subject. (Peters Report at p. 9, ECF #23-3). Dr. Peters' manual, The Tactical Handcuffing for Chain and Hinged-Style Handcuffs, does not limit checking handcuffing tightness to a sole methodology. (Peters Report at Section 2, page 6, ECF #23-3). Visual checking for tightness is the most often used method, and is predicated on the "tip of the index and/or little finger/(pinky) test." (*Id.*). This amount of space, *once seen*, acts as a future "gauge," against which visual inspections can be done. (*Id.*). Dr. Peters opines that Mr. Foster has misunderstood his book and that nothing in it prohibits an officer from physically moving the handcuffs to adequately check for tightness. "If an officer physically moves the handcuffs up and down a suspect's wrists to make sure they are not applied too tightly, I am at a loss as to what else call this inspection."

Mr. Foster's opinions must be stricken because they are unreliable. Mr. Foster lacks experience and knowledge in the area of police officers' handcuffing and checking for the tightness of handcuffs outside of a correctional–type facility with multiple U.S. Marshals always working together with arrestees in a confined facility. Dr. Peters notes that Mr. Foster fails to properly identify the parts of the handcuff during his testimony; that Mr. Foster was never a handcuffing instructor and has never formally taught the subject. (Foster Report, Section 4, pp. 8-9).

Most importantly, Mr. Foster has incorrectly and misleadingly interpreted Dr. Peters' nationally-recognized tactical handcuffing manual to bolster his inadequate and deficient methodology in the opinions he offers in this case. He also states that his own experience guides him in articulating this alleged national standard of care, but has not relayed how his personal experience as a U.S. Marshal translates to a national standard for all law enforcement officers. His opinions based on his personal experience rise no higher than the prohibited *ipse dixit* of an expert that has been ruled insufficient. *See General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). Moreover, he has not worked alone on the streets as a law enforcement officer, but either in a confined correctional-type setting, always paired with another Marshal, or serving warrants, always paired with another Marshal, sometimes two.

As a final issue, Dr. Peters, who teaches at various police and law enforcement academies on a national level, points out that the F.B.I.'s Defensive Tactics Manual does not instruct Special Agents – the nation's law enforcement officers -- to check for handcuff tightness as all; instead it emphasizes the double-locking of the handcuffs, which prevents or minimizes the risk of too-tight handcuffs. (Peters Report Section 2, p. 8, ECF #23-4). A national standard for checking on an arrestee's too-tight handcuffs, if it exists, would presumably be found in the manual for the nation's federal law enforcement agency.

Mr. Foster's report and his opinions must be stricken as a matter of law for lack of reliability, pursuant to this Court's gatekeeping function under *Daubert* and Rule 702.

.

II.     **PLAINTIFF'S ASSAULT AND BATTERY CLAIM MUST BE DISMISSED**

Officer Guida preliminarily references and incorporates the arguments set forth in Section I, *supra*, in his motion to dismiss Count Two, Plaintiff's assault and battery claim. Plaintiff must present admissible expert testimony on her claim that the handcuffs were too tight

and that Officer Guida's refusal to loosen them constitutes an assault and battery. Plaintiff's Count II should be dismissed as a matter of law for her failure to produce admissible expert testimony.

In Count Two, Plaintiff alleges that same factual predicate for all three counts, that Officer Guida, "by refusing to loosen the handcuffs, assaulted and battered her." (Complaint at ¶ 12, ECF #1-2). Assault and battery are often pled in conjunction as a single count in cases alleging police misconduct. *Holder v. District of Columbia,* 700 A.2d 738, 741 (D.C. 1997). Nonetheless, the two intentional torts have different elements of proof: an assault is "an intentional and unlawful attempt or threat, either by words or acts, to do physical harm," while a battery is "an intentional act that causes a harmful or offensive bodily contact." *Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C.1993).

A review of Plaintiff's assertions in her Complaint shows she has made allegations that sound in battery only. She asserts no facts in her Complaint or her sworn testimony that Officer Guida threatened her, by words or acts, to do physical harm. (Complaint, ECF #1-2). She describes tight handcuffs which were not loosened; this allegation constitute an alleged battery, not an assault. *Etheredge v. District of Columbia*, 635 A.2d at 916.

A battery is an intentional tort. "Intent and negligence are regarded as mutually exclusive grounds for liability. As the saying goes, there is no such thing as a negligent battery." 1 DOBBS, LAW OF TORTS § 26 at 51 (2001). When effecting an arrest, an officer commits what may be called a privileged battery: "[I]f the officer does not use force beyond that which the officer reasonably believes is necessary, given the conditions apparent to the officer at the time of the arrest, he is clothed with privilege." *District of Columbia v. Chinn*, 839 A.2d 701, 706 (D.C. 2003). Under District of Columbia law, "a police officer has a qualified privilege to use

reasonable force ..., provided that the means employed are not 'in excess of those which the actor reasonably believes to be necessary.' " *Jackson v. District of Columbia*, 412 A.2d 948, 956 (D.C.1980)). "This inquiry is done 'from the perspective of a reasonable officer on the scene,' with allowance for the officer's need to make quick decisions under potentially dangerous circumstances." *Etheredge*, 635 A.2d at 916. "This standard is similar to the excessive force standard applied in the Section 1983 context." *Rogala v. District of Columbia*, 161 F.3d 44, 57 (D.C.Cir.1998)).

A defendant's motion for summary judgment in an excessive force claim should be denied only when, "viewing the facts in the record and all reasonable inferences derived therefrom in the light most favorable to the plaintiff, a reasonable jury could conclude that the excessiveness of the force is so apparent that no reasonable officer could have believed in the lawfulness of his actions. *Okpara v. District of Columbia*, 174 F.Supp.3d 6, 14 (D.D.C. 2016) (*citing DeGraff v. District of Columbia*, 120 F.3d 298, 302 (D.C. 1997); *Egudu v. District of Columbia*, 72 F.Supp.3d 34, 47–48 (D.D.C.2014)).

Plaintiff does not know what Officer Guida did, or his role in handcuffing and arresting her. (SMF ¶¶14,15). Without any actions that Plaintiff can describe that are attributable to Officer Guida, that Court must rely on the actions that Officer Guida testifies he took. Officer Guida could not be said to be acting unreasonably, as a matter of law, when visually inspecting the handcuffs and physically moving checking them to check for sufficient laxity. As a matter of law, Plaintiff's Count Two must be dismissed for failure to provide admissible expert testimony.

II. **OFFICER GUIDA ENJOYS QUALIFIED IMMUNITY FROM PLAINTIFF'S CONSTIUTIONAL CLAIMS OF HER FOURTH AMENDMENT RIGHTS UNDER 42 USC §1983**

Plaintiff has alleged that Officer Guida used excessive force when he overtightened and refused to loosen her handcuffs. (Complaint, ¶ 12, ECF #1-2).  A plaintiff's claim that an officer has used excessive force is to be analyzed under the Fourth Amendment and its objective reasonableness standard. *Graham v. Connor,* 490 U.S. 386, 390- 95 (1989).  Even if an officer failed to use objective reasonableness required by the Fourth Amendment, and does violate a plaintiff's constitutional rights, qualified immunity will shield the officer from liability unless the right was clearly established at the time of the alleged violation:  "Qualified immunity shields federal and state officials from suit unless a plaintiff alleges facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al–Kidd,* 563 U.S. 731, 742 (2011) (*quoting Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).

The Supreme Court has held that held that the determination of the first prong is a question of law for the court to resolve:

> The first prong of the qualified immunity analysis requires the Court to determine whether At the summary judgment stage, however, once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record,* see Part III–A, *supra,* the reasonableness of Scott's actions—or, in Justice STEVENS' parlance, "[w]hether [respondent's] actions have risen to a level warranting deadly force," *post,* at 1784—is a pure question of law.

*Scott v. Harris*, 550 U.S. 372, 381 (U.S., 2007)

By claiming a violation of her Fourth Amendment rights, Plaintiff claims Officer Guida was objectively unreasonable in his actions by using his visual inspection and physical inspection of moving her handcuffs along her wrists.   Plaintiff asserts that an officer must insert the tip of an index finger into the sides of her handcuffs in order to not violate her constitutional

rights -- notwithstanding her expert's clear inability to quantify the objective amount of space that is being verified when the fingertip process is used. (Foster Depo. at 30:4-22).

Moreover, Mr. Foster provides no rational explanation for the basis of his opinion and simply asserts that "merely to move the handcuffs up and down is not checking for tightness." (*Id*. at 32:14-15). When asked what the officer is checking for, if not tightness, Mr. Foster answers, "I don't know what it is checking for." (*Id*. at 30:19). One could easily posit the reverse with the same methods: inserting the tip of one's index finger is not objectively reasonable in checking for tightness of the handcuffs, because finger sizes vary; however, moving the handcuffs up and down along the wrist demonstrates that the handcuffs are not too tight because there is freedom of movement.

Officer Guida incorporates his arguments from Section One herein, and asserts that Mr. Foster's testimony is inadmissible as a matter of law as it is wholly unreliable and fails to articulate an admissible national standard of care for a methodology by which officers must check the tightness of handcuffs.

Further, as a matter of law, Officer Guida's actions in checking for the tightness of Plaintiff's handcuffs are objectively reasonable, and therefore there was no Fourth Amendment violation of Plaintiff's rights as a matter of law.

A district court has the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan,* 555 U.S. 223, 236, (2009), Should this Court address Plaintiff's allegations starting with the second prong of a qualified immunity analysis, the Court would be guided foremost by case law of the Supreme Court of the United States. The D.C. Circuit has held that the answer to the question of whether a right was 'clearly established,' is controlled by

the following hierarchy of case law: "we look to cases from the Supreme Court and this court, as well as to cases from other courts exhibiting a consensus view," *Johnson v. District of Columbia,* 528 F.3d 969, 976 (D.C.Cir.2008). While the Supreme Court has not required that a case be directly 'on point' for a right to be clearly established, existing case law must have placed the constitutional question beyond debate. *Ashcroft v. al–Kidd,* 563 U.S. at 741

Qualified immunity allows law enforcement officers "breathing room to make reasonable but mistaken judgments' and 'protects all but the plainly incompetent or those who knowingly violate the law.' " *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011). Summary judgment based upon qualified immunity is appropriate if the established law failed to put the officer on notice that his actions would be clearly unlawful. *Saucier v. Katz,* 533 U.S. 194, 202 (2001). As a result, qualified immunity operates to protect an officer when the officer "makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen,* 543 U.S. 194, 198, (2004) (*per curiam* ) (*citing Saucier,* 533 U.S. at 206). The standard of objective legal reasonableness applies to an officer's actions, in the framework of the legal rules that were clearly established at the time. *Corrigan v. Glover*, 254 F.Supp.3d 184, 193 (D.D.C., 2017) (internal citations omitted). "[W]hile an officer's subjective state of mind is not relevant to the qualified immunity inquiry, the officer's perceptions of the objective facts animating the challenged conduct are." *Id.*

In *White v. Pauly* ___ U.S. ___, 127 S. Ct. 548, 551 (2017), the Supreme Court overturned the Tenth Circuit's decision denying qualified immunity to an officer. *Id.* There, an officer fired at the occupant of a house who was pointing a gun in his direction; the Tenth Circuit had held that a jury could have concluded that a reasonable officer would have believed that a warning was required despite the serious threat of harm. *Id.* The Court noted it had issued

several opinions in the last five years reversing federal circuit courts on the issue of qualified immunity:

> Today, it is again necessary to reiterate the longstanding principle that "clearly established law" should not be defined "at a high level of generality." *Ashcroft v. al–Kidd,* 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). As this Court explained decades ago, the clearly established law must be "particularized" to the facts of the case. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.,* at 639, 107 S.Ct. 3034

*Id.*

The "clearly established law" analysis requires a prior case where an officer is in similar circumstances and acting similarly to Officer Guida. *Id.* at 552. The Supreme Court specifically rejected the Tenth Circuit's reliance on the oft-cited principals of *Tennessee v. Garner*, 471, U.S. 1 (1985) and *Graham v. Connor* 490 U.S. 386 (1989) for evidence of "clearly established law," and held that those cases only describe excessive force principles at a general level. *Id.*

In the particularized facts of this case, Plaintiff cannot identify what role Jeremy Guida played in her arrest or applying handcuffs. (SMF ¶¶ 14-16) She was asked multiple times what each officer did. She admitted every time she did not know. (*Id.*). She stated that a red-haired 200 pound officer was the officer that initially stopped her and that Officer Guida showed up two minutes later. (SMF ¶¶ 13, 17, 18, 19). She states that she was facing the wall when the handcuffs were applied. (SMF ¶ 15). Officer Guida testified that the only time he was became aware that Plaintiff claimed that the handcuffs were too tight was when he, other officers and Plaintiff were waiting for the transport police van to take Plaintiff to MPD's District One. (SMF ¶¶ 52, 53). He approached Plaintiff and checked the handcuffs both visually and physically, by moving the handcuffs up and down on Plaintiff's wrists, to see if they moved freely. (SMF ¶¶ 52, 53). As he witnessed that the handcuffs did move freely, he made no adjustments. (*Id.*).

Under the Supreme Court's re-emphasized standards for the second prong of qualified immunity, there is no "clearly established" law" that would put any officer, including Officer Guida, on notice that by checking an arrestee's handcuffs for tightness by both a visual inspection and by physically checking for ease of movement of the handcuffs along an arrestee's wrists, that Officer Guida would be violating an arrestee's constitutional right to be free from excessive force.

Wherefore, for the reasons stated, Office Guida moves that his claim of excessive force be dismissed as he has qualified immunity as a matter of law under the facts of Plaintiff's particularized claim of excessive force under the Fourth Amendment.

IV. **THERE ARE NO COGNIZABLE CLAIMS ALLEGED IN PLAINTIFF'S COMPLAINT UNDER THE FIFTH AMENDMENT OR UNDER 42 U.S.C. § 1988**

In an abundance of caution, Officer Guida addresses Plaintiff's fleeting reference under the "Jurisdiction" section of her Complaint, in which in one sentence, states that she brings her claims pursuant to, ". . . 42 USC §1983, § 1988 and the Fourth and Fifth Amendment of the United States Constitution." A claim under 42 U.S.C. § 1988 is not a claim supporting a cause of action, but statute which allows a court, in its discretion, to award attorney's fees to a prevailing party. *See* § 1988. Proceedings in vindication of civil rights, 42 USCA § 1988. Plaintiff has no cause of action for attorney's fees in this matter, nor has she been adjudicated a prevailing party and any claim based upon § 1988 must be dismissed as a matter of law.

As to her Fifth Amendment claim, Plaintiff has not alleged any facts in Count Three that pertain anything other than the over-tightening of her handcuffs by MTPD officers and their failure to loosen the cuffs. This is an excessive force allegation. Plaintiff herself alleges that the handcuffing deprived her of her right to be free from excessive force during the course of her

arrest, as guaranteed by the Fourth and Fifth Amendment.  (Complaint, ¶¶ 15-18, ECF #1-2; *see*

Section III, *infra*).  Long established Supreme Court requires that excessive force claims be

analyzed under the Fourth Amendment and its reasonableness standard. *See Graham v. Connor,*

490 U.S. 386, 390- 95 (1989).  Plaintiff's reference to the Fifth Amendment, in the context of an

excessive force claim is an incorrect standard of law.   Plaintiff's Fifth Amendment claim must

be dismissed as a matter of law.

Respectfully Submitted,


WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY

/s/ Janice L. Cole
Janice L. Cole #440351
Chief Counsel - MTPD
WMATA
600 5th St., N.W.
Washington, D.C.  20001
(202) 962-2543
(202) 962-2550 (facsimile)
Counsel to All Defendants

 /s/ Neal M. Janey, Jr.
Neal M. Janey, Jr., Bar No.:  995449
Associate General Counsel
600 Fifth Street, N.W.
Washington, D.C.  20001
Telephone: (202) 962-1067
Facsimile:  (202) 962-2550
E-mail: nmjaney@wmata.com
Counsel to all Defendants

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true copy of the foregoing Motion for Summary Judgment, Memorandum, Statement of Material Facts, Order and Exhibits was served by the court's electronic filing system on this 4th day of September 2018, to:

> Geoffrey D. Allen
> 1730 Rhode Island Avenue, NW
> Suite 206
> Washington, DC  20036
> (202) 778-1167 (o)
> (202) 659-9536 (f)
> geoffreyallen@verizon.net

> /s/ Janice L. Cole
> Janice L. Cole

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DELPHINE TAYLOR | : |
| | : |
|       Plaintiff, | : |
| v. | : CASE NO. 17-00123 RBW |
| | : |
| WASHINGTON METROPOLITAN | : |
| AREA TRANSIT AUTHORITY, et al. | : |
| | : |
| | : |
|       Defendants. | : |


## OFFICER GUIDA'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE


1. On January 27, 2016, at approximately 6:26 p.m., Plaintiff was a WMATA rail passenger and exited through the fare gates at WMATA's Gallery Place Metro Station. (Complaint, ¶ 5, ECF 1-2 at page 2).

2. Plaintiff admits that she did not use her fare card to exit through the fare gate; she also admits that she did not use her fare card to enter WMATA's rail system. (Plaintiff's Deposition (Pl. Depo.) at 79:14-20).

3. Plaintiff gives no reason as to why she didn't use her fare card to enter or exit the system that day. (Pl. Depo at 82:1-7).

4. An MTPD officer saw Plaintiff go through the gate without paying her fare and "came out of nowhere," telling her, "hey, come back through the gate." (Pl. Depo. at 78:14-17).

5. She understood the reason that the officer asked her to turn around and come back through the fare gates was because she didn't pay and that she had been caught. (Pl. Depo. at 83:13-15).

6. The officer told her she was being arrested for failure to pay a fare. (Pl. Depo. at 78:19-

22).

7. It only took about a minute to handcuff her. (Pl. Depo. at 90:11-12).

8. Another officer arrived in another minute or two. (Plaintiff Depo. at 90:8-11).

9. The officers took her upstairs and there were three other cops there. (Pl. Depo. at 79:6-8).

10. Plaintiff does not know who the officer was that saw her going through the fare gate without paying her fare. (Pl. Depo. at 82:19-22).

11. Plaintiff does not know the officers names; the officers all look alike to her and they all wear the same blue uniform. (Pl. Depo. at 83:2-5).

12. Plaintiff states that she saw the three or four officers approximately for fifteen minutes during the whole of this interaction. (Pl. Depo. at 83:8-10).

13. Plaintiff identifies Officer Jeremy Guida during her deposition as the second officer that arrived later at the time of her arrest. (Pl. Depo. at 85:7-16; 90:18 – 91:10).

14. Plaintiff does not know what role Officer Guida played in her arrest. (Pl. Depo. at 85:22-86:2).

15. Plaintiff does not know what Officer Guida did for any of the handcuffing procedure, because she was standing facing a wall and the officer were behind her back. (Pl. Depo at 91:7-10).

16. Officer Guida is not the officer who initially approached Plaintiff to call her back through the fare gates. (Pl. Depo. at 86:3-18).

17. The officer who initially approached Plaintiff has red hair. (*Id.*).

18. Officer Guida has dark hair, and "looks Spanish." (Pl. Depo. at 85:12-18).

19. The officer with the red hair was arguing with Plaintiff. (Pl. Depo. at 93:3 – 94:17).

20. Plaintiff does not know how or why Officers Young and Guida were named in her suit.

(Pl. Depo. at 95:9-20).

21. Plaintiff does not know what in particular that Officer Guida did in terms of the handcuffing, the arrest, or what he said.  (Pl. Depo. at 96:5 – 97:13).

22. Plaintiff alleges that it was the red-haired officer who was rude and that he didn't do anything when she complained.  (Pl. Depo. at 97:15 – 98:7).

23. Plaintiff and her attorney take a break during her deposition. (Pl. Depo. at 101:17-22).

24. After the break, Plaintiff announces that Officers Guida and Young were the two officers present and behind her at the time of her arrest.  (Pl. Depo. at 106:5-19).

25. Plaintiff insists in her sworn deposition testimony that counsel for defendant informed Plaintiff that Officers Guida and Young were present at the time of her arrest and handcuffing.  (Pl. Depo. at 106: 20 – 108:10).

26. The deposition transcript word index for "Guida" shows that the word appears one time before Plaintiff identifies officers Guida and Young by name as being present at her arrest, on page 95:10-11. (Pl. Depo., word index for "Guida" at 7).

27. In the question asked on 95:10-11, no officers are identified as being present at Plaintiff's arrest; rather the deposition question is how did Plaintiff decide to sue these two officers. (Pl. Depo. 95:10-11).

28. Officer Young, according to Plaintiff, likes like 'Officer Krupke' of West Side story, *i.e.*, Caucasian, 200-some pounds, red hair with side burns.  (Pl. Depo. at 111:6-19).

29. Officer Guida arrived after Officer Young.   (Pl. Depo. at 112:4-12).

30. Plaintiff was facing the wall at the time the handcuffs were put on here. (*Id.*)

31. Plaintiff said the handcuffs were too tight two seconds after they were put on her.  (Pl. Depo. at 113:19 – 114:3).

32. Plaintiff went upstairs with the officers to the kiosk area, where the station manager's booth is located. (Pl. Depo. at 117:1-19).

33. Plaintiff states she complained about the cuffs being too tight to another officer, who she cannot identify, other than the Guida and Young. (Pl. Depo. at 118:6-20).

34. Plaintiff was taken by car to the District One police station, a ride that took by Plaintiff's estimate, ten to twenty minutes. (Pl. Depo. at 120:5-18).

35. Her handcuffs were taken off immediately upon her arrival at the police station, and she was put into a little room there. (Pl. Depo. at 121:1-10).

36. During Officer Christopher Young's deposition, he explained that he was not on the scene at the time of Plaintiff's arrest. (Young Depo. at 6:17 – 7:18).

37. Officer Guida used Officer Young's sign-in to gain access to police database, causing Officer Young's name to populate the police report. (*Id*.; Guida Depo at 50:6 – 51:6).

38. Officer Young has dark brown hair and not red hair. (Guida Depo at 41:10-22).

39. Officer Guida testified that was he witnessed Plaintiff exit the fare gates without paying a fare, but entering the fare gates quickly behind another passenger who had paid. (Guida Depo at 15:9 – 17:6).

40. No other officer was acting as partner to help Guida at the time he arrested Plaintiff. (Guida Depo. at 20:5-9).

41. Guida saw Plaintiff exit by stepping directly behind a paying customer exiting the fare gates without it appearing that Plaintiff paid her own fare. (Guida Depo at 15:7-13).

42. Guida called for Plaintiff to stop and to come back through the fare gate so he could examine her SmarTrip card. (Guida Depo at 20:12-22).

43. Guida testified that when Plaintiff turned and came back towards him, Officer Guida

asked for her SmarTrip card; Plaintiff then turned around, ignoring his request and attempted to leave. (Guida Depo at 22:7-9).

44. To prevent her leaving, Officer Guida grabbed her by the arm and placed her under arrest for fare evasion. (Guida Depo at 22:13-19).

45. Guida handcuffed her using an MTPD-issued Peerless brand, hanged set of handcuffs. (Guida Depo. at 25:2-7).

46. When Officer Guida applies handcuffs to a person, he has the person place their hands behind their backs with their palms together, thumbs facing down to the ground. (Guida Depo. at 27:22).

47. Officer Guida places the handcuff on one wrist at a time checks for adequate room and slackness by both visually and physically inspecting the handcuffs. (*Id.*)

48. Visual inspection of the handcuffs entails Officer Guida looking to see if there are gaps on each side and physical inspection means he makes sure that the handcuffs can move along the wrist. (*Id.*).

49. The physical inspection can be moving the handcuffs back and forth from side to side or moving them up and down. (Guida Depo at 28:7-12).

50. After conducting both visual and physical inspections of the handcuffs, Officer Guida then double-locks the handcuffs. (*Id.*).

51. Double-locking the handcuffs prevents the cuffs from getting any tighter. (Guida Depo. at 28:15-20).

52. Guida testified that Plaintiff never told him that the handcuffs were too tight; however, while they were waiting for the police transport van at the kiosk area of Seventh and F, another officer approached him and said told him that Plaintiff thinks her handcuffs were

too tight. (*Id*. at 33:18 – 34:16).

53.   Officer Guida approached Plaintiff while waiting for transport and checked the handcuffs as he has described, by both visual inspection and physical inspection of moving the handcuffs along Plaintiff's wrists. He remembers bending over at the waist and determining that they were not too tight. (*Id.*).

54.  Officer Guida states it took about 10-15 minutes to arrive from Gallery Place to the First District police department.   (Guida Depo at 44:12-19).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DELPHINE TAYLOR     :
           :
  Plaintiff,     :
v.         : CASE NO. 17-00123 RBW
           :
WASHINGTON METROPOLITAN :
AREA TRANSIT AUTHORITY, et al. :
           :
           :
  Defendants.    :


## ORDER


UPON CONSIDERATION OF Defendant Guida's motion for summary judgment, any

opposition thereto, and for Good Cause shown, it is this ___ day of _____ hereby,

ORDERED, that Plaintiff' Complaint be, and hereby is, dismissed with prejudice.


_____
JUDGE, U.S. DISTRICT COURT



Copies to:

Geoffrey Allen
Janice Cole