**IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF
COLUMBIA**

DELPHINE TAYLOR                    :
                                           :
         Plaintiff,                  :
                                           :
v.                                      : CASE NO. 17-123 RBW
                                  :
                                           :
JEREMY GUIDA                    :
                                           :
         Defendant.              :

## <u>PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT BY JEREMY GUIDA</u>

Defendant Jeremy Guida has moved for summary judgment as to all counts in

Plaintiff's Complaint. Plaintiff opposes Defendant's Motion for the reasons set forth in the

attached Memorandum of Points and Authorities.


                                    Respectfully Submitted,

                                    /s/_____
                                    Geoffrey D. Allen
                                    1030 15th St. N.W.
                                    Suite 555W
                                    Washington, DC  20036
                                     (202) 778-1167 (o)
                                     (202) 898-2571 (f)
                                     E-Mail: geoffreyallen@verizon.net

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true copy of the foregoing Opposition to Defendant's Motion for Summary Judgment was served by the court's electronic filing system on this 5th day of October, 2018 on:

Janice L. Cole.
600 5th St., N.W.
Washington, D.C. 20001
(202) 962-2543
(202) 962-2550 (facsimile)


/s/_____
Geoffrey D. Allen

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | |
|---|---|
| DELPHINE TAYLOR | : |
| | : |
|     Plaintiff, | : |
| | : |
| vi. | : CASE NO. 17-123 RBW |
| | : |
| | : |
| JEREMY GUIDA | : |
| | : |
|     Defendant. | : |

### MEMORANDUM IN SUPPORT OF OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JDUGMENT

### FACTUAL BACKGROUND

On January 27, 2016, at about 6:26 p.m. at the Gallery Place Metro station, Plaintiff was stopped just after exiting the fare gates by  Metro Police officer Jeremy Guida. Officer Guida observed her pass through the faregate without paying the fare.  He claims he asked her to stop but she walked away, at which point he arrested her for fare evasion.  Officer Guida then handcuffed her with her hands behind her back, at which time, Plaintiff alleges that she immediately complained that the handcuffs were hurting her wrists.  According to Plaintiff,  Officer Guida and another officer who was present, took no action to check or loosen the handcuffs.  Plaintiff was then walked to the 7th St. and F St NW exit where she waited for a transport vehicle to take her to a police station.  Officer Guida was present at all times.   Plaintiff again complained that the handcuffs were  too tight and hurting her wrists.  Again, she claims, her complaints were ignored.  Approximately forty five minutes to an hour after her arrest,  she arrived at a police station where the handcuffs were removed.

Plaintiff was taken to Court the next day.  Her case was called late in the day and was "no papered."  The next day, Plaintiff sought medical treatment at the Veteran's Administration Hospital where she complained of soreness to both wrists.   Subsequently, she was seen by Dr. Michael Batipps a neurologist, who diagnosed a superficial radial nerve injury to her wrists which in his opinion was proximately caused by overtight handcuffs.

At his deposition, Officer Guida stated that after applying the handcuffs he visually checked them and also moved them to make sure that they were not too tight.  Plaintiff specifically denies that he moved the handcuffs along her wrists after he put them on. Plaintiff's expert, Randy Foster a person with extensive experience in law enforcement, has opined that the correct method for checking handcuffs for tightness is  to place the tip of the index finger between the bracelet of the handcuff and the subject's wrist on the top, bottom and sides.  He further opined that the test Officer Guida claims he did would not comply with the national standard of care.

### STANDARD OF REVIEW

The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified."  *Taxpayers Watchdog, Inc. v. Stanley*  810 F.2d 294,297 (D.C Cir. 1987). When a motion for summary judgment is under consideration, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty Lobby* , 477 U.S. at 255,  106 S.Ct. 2205; *see also Mastro v. Pepco,*  447 F.3d 843, 850 (D.C. Cir. 2006).

**ARGUMENT**

I.  **PLAINTIFF PRESENTS A VALID NEGLIGENCE CLAIM**


  A. **PLAINTIFF MAY MAINTAIN BOTH HER NEGLIGENCE AND BATTERY CLAIMS**

Defendant relies on *Dist. of Columbia v. Chinn,* 839 A.2d 701, 707 (D.C. 2003) in support of his argument that Plaintiff's negligence claim should be dismissed.  In, *District of Columbia v. Chinn,* 839 A.2d 701 (DC, 2003), Chinn alleged that the defendants committed negligence by violating D.C. Code § 4-176 by using "unnecessary and wanton severity while arresting Plaintiff" and they "breached their duty as they were negligent in their excessive use of force" Id. at 711.  Hence, rather than distinctly pleading separate causes of action, Chinn intertwined his negligence and excessive force claims into one claim.  The Court ruled that there was no cause of action for "negligent assault."

In this case, Ms. Taylor did not conflate her claims into one "negligent assault" count.  She separately pled assault, alleging Officer Guida  intentionally used excessive and unnecessary force and in a separate count and in the alternative, alleged that he failed to exercise reasonable care.  Hence, from a pleading standpoint, it is clear that Ms. Taylor distinctly pled separate theories of liability; one based on intent to injure and one based on carelessness and a violation of  the standard of care.

In addition to ruling that there was no such cause of action as a negligent assault the Court in *Chinn*  also stated that  every arrest was an "unwanted touching" and therefore a battery.  Police officers were only saved from liability by the doctrine of qualified privilege which shielded them from liability so long as their conduct was subjectively and objectively reasonable.   If an officer injured an arrestee accidentally during the course of an arrest, liability could be imposed because the injury flowed from the battery, so long as the officer's

5

actions were also not protected by qualified privilege. As the Court stated in *Chinn,* "An unwanted touching may in its inception be intentional, a battery, or accidental, possibly negligent. But once it is found to be intentional, a battery tortfeasor is liable for the full range of consequences, intended or not, including harm and transferred liability." Id. at 707. The Court then continued: "Therefore, where the excessive force is the product of a battery, an unwanted touching inherent in any arrest, which escalates in an unbroken manner into excessive force, the cause of action is a battery alone, with the privilege having ended at the point where excessive force began." Id. at 707.

The approach in *Chinn,* appears to be somewhat at odds with a number of previously decided cases. In, *District of Columbia v. Downs*, 357 A.2d 857 (DC, 1976), a police shooting case, the Court stated: "These interrogatories, when viewed in the context of the court's instruction, posed to the jury whether Ramirez deliberately and intentionally shot Downs or whether the shooting resulted from the failure of Ramirez to act as a reasonably prudent person would under the circumstances of his confrontation with Downs. The jury answered that Ramirez did not assault Downs in the sense of deliberately shooting him, but that he did act negligently and his negligence was the cause of the death of Downs. Given the testimony which we have outlined above we are unable to say there was insufficient evidence to support the jury's verdict." Id at 860. Hence, in that case, it appears that both negligence and battery were submitted to the Jury in the alternative, which is exactly how Plaintiff has framed her Complainti in this case. In, *District of Columbia v. White*, 442 A.2d 159 (DC, 1982), likewise, the appellate Court found no error in submitting a negligence claim as well as an assault and battery claim to the jury. In, *Etheredge v. District of Columbia*, 635 A.2d 908 (DC, 1993), a jury award, in a police shooting case, based on assault and battery and negligence was upheld. And in, *District of Columbia v. Evans*, 644 A.2d 1008 (DC, 1994) the Court stated : "[A]lthough the jury verdict on the assault and battery claims indicates that the officers did not act deliberately

when they shot Virtus Evans, this does not preclude plaintiff from claiming that the officers were negligent in shooting Evans. Nor does it preclude litigation of plaintiff's theory that the officers' conduct was negligent during the period of time leading up to the shooting."  Id. at 1019-20.   In, *Holder v. District of Columbia*, 700 A.2d 738 (DC, 1997) again, the submission of assault and battery and negligence counts in yet another police shooting case was affirmed.   In that case, the Court stated: "When an individual is shot by a District of Columbia police officer, and he or his successors in interest decide to bring a lawsuit, they may proceed under one or more different common law theories of legal liability. For example, they may sue for the common law intentional torts of assault and battery.*See Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C.1993); *District of Columbia v. White*, 442 A.2d 159, 162-64 (D.C. 1982); *District of Columbia v. Downs*, 357 A.2d 857, 859-60 (D.C.1976). Suit may also be predicated upon one or more theories of negligence, including the officer's negligent act of shooting the victim."

The *Chinn* Court, which did not overrule these cases, sought to reconcile them by agreeing that in some cases, both negligence and assault and battery could be claimed, deciding that "…in a case involving the intentional use of force by police officers, [where] a negligence count is to be submitted to a jury, that negligence must be distinctly pled and based upon at least one factual scenario that presents an aspect of negligence apart from the use of excessive force itself and violative of a distinct standard of care" Id. at 711.

Plaintiff in this case can satisfy these requirements.  It is important to note that factually there are two distinct sets of allegations made by Ms. Taylor.  Firstly, she is alleging that Officer Guida applied the handcuffs too tightly and failed to test for excessive tightness after he put them on after she was arrested near the faregate.  She also claims that while awaiting transport she complained of tightness again and that Officer Guida again

failed to test them for tightness or loosen them. The first incident arguably supports a finding of a failure to take reasonable care. That is, either not knowing how to test for excessive tightness in compliance with the standard of care or simply not bothering to do the correct test. The second incident however, suggests, if true, a far more reckless or intentional disregard for the safety of Ms. Taylor. Hence, it appears that different states of mind on the part of Officer Guida support distinct claims for negligence and battery in two separate incidents.

## B. PLAINTIFF HAS ESTABLISHED A BASIS FOR ASSERTING A VIOLATION OF THE NATIONAL STANDARD OF CARE

Defendant complaints that Plaintiff has failed to produce admissible evidence of the standard of care required of police officers in handcuffing arrestees and determining whether the handcuffs are too tight. Defendant t asserts that the report and testimony of Plaintiff's 26(a)(2) liability expert, Randy Foster, a retired U.S. Marshal, is not reliable as required under Federal Rule of Evidence 702. Defendant further asserts that his understanding of an authoritative treatise on handcuffing, writing by a national expert on the subject, Dr. John G. Peters, Jr.is erroneous.

Dr. Peters book contains the following language: "Generally speaking, after you have applied the handcuffs you should be able to slip the tip of your index finger under handcuffs, on the top, bottom and sides (see line drawing No.3)" The drawing in the book shows a person actually inserting their finger between the handcuff and the wrist. There is no admonition in Dr. Peters' book that even though his diagram shows an officer putting his finger between the handcuff and the wrist – that this shouldn't actually be done. Nowhere does he claim that a visual inspection alone is sufficient. Hence, there is in

Plaintiff's submission a  disconnect between what Dr. Peters appears to say  in his book which was published in 1988 and what he is saying now as a paid expert for the Defendant. Plaintiff submits that the most reasonable inference that a reader of his book would make is precisely the one that Randy Foster made in this case, that is where a fully compliant arrestee is being placed in handcuffs a "fingertip" test should be used. Certainly, a reasonable finder of fact could conclude that this is the case.  Dr Peters explanation that he meant something else does not have to be accepted by a factfinder particularly in view of the very plain meaning of the actual text and illustration in his book.

But this is not all that Mr. Foster relied on in establishing the standard of care in this case. Mr. Foster has a lifetime of experience in law enforcement, as a police officer, a detective, an Air Marshall and Air Force Police officer  and a U.S. Marshall. He testified in his deposition that he personally has  handcuffed at least a thousand people.  He stated that he has never seen the method of testing now suggested by the defense taught in any academy that he has attended. He has worked in law enforcement in many different locations across the country.  In short, he has very extensive experience on a national level.

He also relied on training materials of the District of Columbia Metropolitan Police Department which states that the correct procedure is  after having placed the handcuff on, to place the tip of the index finger between the bracelet and the subject's wrist such that the officer should be able to slip the finger under the handcuffs on the top, bottom and sides of the prisoner's wrist.  In his report, Mr. Foster also stated that this is the method used by the U.S. Marshall's Service, the Air Marshall's Service and every other policing organization that that he is familiar with.  Clearly, the U.S. Marshalls and the Air Marshalls  and the Air Force Police are national organizations which operate all over the United States.  Mr. Foster worked as a detective in Fayettville, North Carolina. He is also a member of national policing organizations such as: Fraternal Order of Police, The Federal Law Enforcement

Officers AssociationNational Organization of Black Law Enforcement Officer**s**.   Hence,

Mr. Foster has laid out a national basis for his opinion that the "fingertip" test is in fact the

national standard of care.  Plaintiff notes that none of this national experience is challenged

by the Defendant.  Nor do they contest that the fingertip test is the actual test used across

the country by the US Marshalls, the Air Force Police, the Air Marshalls Service or the

District of Columbia Police or the Fayetville Police in North Carolina.


        The law of the District of Columbia is that the  expert must relate his opinions on

nationally recognized written standards or on practices generally followed by comparable

facilities. As the Court noted in: *Clark v. District of Columbia*, 708 A.2d 632, 634 (D.C.

1997):

    …. the expert must clearly relate the standard of care to the practices in fact
    generally followed by other comparable governmental facilities or to some
    standard nationally recognized by such units.

Mr. Foster has done precisely that.  He had pointed to national organizations which follow

the practice he sets forth as the standard of care. He has related his opinion to a practice

that is generally followed by comparable police forces across the country.  This case is

virtually identical to *Okpara v. District of Columbia,*  174 F. Supp. 3d 6 (DDC 2016).  In

that case, Okapara was also arrested for a minor offense, scratching her husband's face.

She was handcuffed and immediately complained that the handcuffs were too tight.  She

alleged that the officers ignored her complaints and left her in the handcuffs which caused

injuries to her wrist. The defendant moved for summary judgment claiming that Plaintiff's

expert had not established the national standard of care.  The Court noted that plaintiff's

expert had grounded his opinion on, as here, training materials from the District of

Columbia and his own knowledge of police practices in other jurisdictions, such as

Virginia, Maryland and on the West Coast.  The Court ruled that  , taken together, the

expert's report and the deposition were sufficient to show that he has "articulate[d] and reference[d] a standard of care by which the defendant[s'] actions can be measured." Id. at 13. In this case, Mr. Foster's experience of national policing organizations would appear to be more extensive than that of the expert in *Okpara*. And like, the expert in that case, Mr. Foster also relies on training materials from the District of Columbia Metropolitan Police. While this Court is not bound to follow *Okpara,* it is respectfully submitted that it is a well reasoned opinion which correctly applied District of Columbia law in this area.

### C. PLAINTIFF'S EXPERT HAS PRESENTED RELIABLE TESTIMONY

Defendant takes no issue with Mr. Foster's testimony that the "fingertip" test is used by the many national policing organizations that he has worked for. Or that it is the method used by the Metropolitan Police Department or that it is the method used in North Carolina. His claims of unreliability are grounded principally on his reading of Dr. Peters' book which is now contradicted by Dr. Peters. As we have seen however, the actual text of Dr. Peters' book is clear. It actually contains a diagram showing an officer inserting his finger between the bracelet of the handcuff and the arrestee's wrist. So, a reasonable factfinder could conclude that what he saying now, as a paid expert for the defense is not credible. This is particularly the case when one considers the rationale for his disavowal of the "fingertip" test. He claims that it would be dangerous for an officer to conduct such a test. However, Mr. Foster clearly premised his opinion on using such a test where the prisoner was compliant. In this case, there is no dispute that Plaintiff was calm and fully compliant when she was being handcuffed. Obviously, a police officer is not expected to do this in the case of a subject who is violently resisting. Dr. Peters reasoning for his claim that the finger test is too dangerous to be used – in Plaintiff's submission clearly lacks credence.

Defendant claim that Mr. Foster's testimony is unreliable because fingers come in various sizes and he was unable to present an opinion on the precise metrics of how much space should be left between handcuff and wrist. This too is an argument that lacks force. A reasonable officer can surely appreciate whether or not he or she has an unusually large or small index finger and if they do, can still gauge how much space there is by putting their finger against the cuff or by using a smaller or larger finger. In other words a reasonable officer can make common sense adjustments in order to make sure that there is enough space to prevent injury at the same time as maintaining security.

Mr. Foster also opined that in his experience there could be some movement of the cuff on the wrist and that it could still be tight enough to cause injury. That aspect of his testimony is not challenged by either of the two defense experts.

Defendant also attacks Mr. Foster's qualifications as an expert in this area claiming that his experience is primarily derived from a "correctional type" environment which is "quite different" from the environment in which Officer Guida operates. However, this claim is contradicted by Mr. Foster's unchallenged testimony at deposition that as a US Marshall he was also responsible for conducting arrests of fugitives from justice. These arrests constituted a significant portion of his activities as a U.S. Marshall and clearly would occur in non-correctional settings.. The defense also ignores his work as an Air Marshall, an Air Force Police officer, and as a detective in North Carolina – all of which would appear to be comparable experience to Officer Guida's. . And the defense fails to explain how handcuffing procedures should differ, whether or not the handcuffing was in a correctional setting or out on the street. In this case for example, Plaintiff was arrested for a very minor non-violent offense and offered no resistance to Officer Guida when he placed the handcuffs on her. How exactly, that required any deviation from the standard method of handcuffing and testing for over tightness is difficult to appreciate.

Defendant next complains that Mr. Foster does not ground his opinions on any tests or data and that because of that his opinions are unreliable. Plaintiff notes that neither of the two defense experts do either. Mr. Foster has based his opinions on his knowledge of a nationwide practice used by federal and local police forces across the country which is clearly sufficient. Reliance of tests and data is often required in cases involving scientific opinions as in *Daubert* itself but in this case the task at hand is to establish a prevailing practice which Mr. Foster has clearly done. Defendant fails to point to a single case where reliance on tests or data have been required in a handcuffing case and Plaintiff's counsel has also been unable to find any.

Finally, Defendant claims that because Dr. Peters claims that the FBI does not instruct its agents to test for tightness at all that this somehow completely negates Mr. Foster's testimony that the "fingertip" test is used in all the police forces that he cites. Moreover, Dr. Peters own book at the very least states that a test of some sort needs to be done. In his report, he states that this requirement can be met by observing movement of the cuff rather than placing a finger between the cuff and the wrist. Mr. Key likewise does not suggest anywhere in his report that an officer can not use any test. It appears then that if the FBI does not train in this area  --- it should.

The defendant also urges the Court to reject Mr. Foster's testimony because he claims that Mr. Foster does not explain why the test officer Guida  claims he did is not sufficient to avoid injury. Plaintiff would note  that this would appear to be an issue that should be addressed by a medical expert rather than a police expert. Exactly, what degree of tightness is enough to cause injury to the superficial radial nerve in the wrist is not  something a policeman has expertise in. However, he did testify that in his experience as an  officer with over twenty years of experience of handcuffing people and supervising others who used handcuffs there could be some movement in the handcuff and it could still be tight enough to  injure the person who was handcuffed. This area is not doubt one

which defendant is entitled to probe through cross examination but it is surely not a sufficient basis to bar Mr. Foster's testimony.

Taken as a whole, Plaintiff submits, Mr. Foster is well qualified to offer an opinion in this case and that he has properly laid a foundation to establish the national standard of care.  His testimony is also reliable.  None of the objections raised by officer Guida raise sufficient questions to disqualify him as an expert in this case.

## II.   PLAINTIFF'S ASSAULT AND BATTERY CLAIM SHOULD NOT  BE DISMISSED

Defendant makes the dubious claim that Plaintiff's battery claim must be dismissed because " Plaintiff does not know what Officer Guida did , or his role in handcuffing and arresting her."  It is true that  Plaintiff claims that two officers were present when she was arrested and that she was handcuffed with her hands behind her back so that she is unable to say which officer placed the handcuffs on her.  However, this is of no significance in this case because Officer Guida, in his deposition, clearly admitted  that he handcuffed Plaintiff. Moreover,  Plaintiff said she immediately complained that the handcuffs were on too tight and that no action was taken to loosen them.  Officer Guida did not recall that but admitted his presence from the time of the arrest to the time she arrived at the police station.  A reasonable factfinder could therefore credit Plaintiff's testimony about the initial complaint, and conclude that Officer Guida was present and took no action to correct the situation. Moreover, there is no disagreement that Plaintiff complained again while waiting for transport at the 7th and F St. exit, that Guida was present, knew about her second complaint and that again failed  to loosen the handcuffs.

While it is true that Officer Guida testified at his deposition that he checked the handcuffs by physically moving them and visually inspecting them a Jury is not bound to accept this.  Indeed, although Plaintiff cannot say whether or not he visually inspected the

handcuffs after he placed them on her, because her back was turned, she can and does state that she did not feel the handcuffs being moved up and down or from side to side on her wrists.  In view of this, Plaintiff submits Defendant's claims in this regard lack any merit and should be rejected.

III.  **OFFICER GUIDA MAY NOT CLAIM QUALIFIED IMMUNITY FROM PLAINTIFF'S CONSTIUTIONAL CLAIMS OF HER FOURTH AMENDMENT RIGHTS UNDER 42 USC §1983**

The Fourth Amendment to the United States Constitution guarantees the right of citizens "to be secure in their persons ... against unreasonable searches and seizures." U.S. Const. amend. IV). The "Fourth Amendment's freedom from unreasonable searches and seizures [also] encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee v. Ferraro,* 284 F.3d 1188, 1197 (11th Cir.2002) (citing *Graham,* 490 U.S. at 394–95, 109 S.Ct. 1865). To enforce these rights, citizens may bring claims under 42 U.S.C. § 1983. *See Graham,* 490 U.S. at 394, 109 S.Ct. 1865.[7]

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court set forth a two-step process for determining whether qualified immunity should apply in a particular case. The first inquiry under *Saucier* is whether the facts, taken in the light most favorable to the party claiming to have been injured, show that the government official's conduct violated a constitutional right. *Id.* at 201, 121 S.Ct. 2151. If no constitutional right was violated, qualified immunity is appropriate. *Id.* If the plaintiff's rights were violated, the court must next assess whether,

"in light of the specific context of the case," the right in question was "clearly established." *Id.* A right is " 'clearly established' " if " 'the contours of that right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Butera v. District of Columbia,* 235 F.3d 637, 646 (D.C.Cir.2001) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

A. **Plaintiff has Presented Evidence of a Constitutional Violation**

In, *Dormu v. Dist. of D.C.,* 795 F.Supp.2d 7 (D. D.C., 2011),  Dormu was arrested for disorderly conduct.  He alleged the handcuffs to be on him "very tightly," and brought this to the officer's  attention.  The officer, according to Dormu, "pretty much ignored me. One time I said it and then another time I said it, he said shut the fuck up."  Dormu alleged that he suffered nerve damage to his wrists and that the officer used excessive force in violation of the Fourth Amendment..  The Court held that in evaluating excessive force claims, applied by an objective reasonableness standard set forth in  *Graham v. Conner,* 490 U.S. 384, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)   There the Court held that : "…..the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."

The *Dormu* Court considered, whether the plaintiff was actively resisting or attempting to evade arrest, and whether the plaintiff posed an immediate threat to the officer's or others' safety. *Graham,* 490 U.S. at 396, 109 S.Ct. 1865. The Court also considered the severity of the injury the plaintiff . citing  *Wardlaw v. Pickett,* 1 F.3d 1297, 1304 n. 7 (D.C.Cir.1993) (stating that although the severity of injury "is not by itself the basis for deciding whether the force used was excessive, ... it is a relevant factor").

The Court noted that  Dormu alleged  that the officer placed handcuffs on him that were excessively tight and  refused to respond to his complaints about the tightness. . Dormu

alleged that throughout the encounter he did not resist the officers and that he suffers from numbness in the small and ring finger.  In view of that, the Court concluded that "….  Applying the *Graham* factors to the facts in this case and considering the conduct alleged with respect to each officer, the Court concludes that Dormu has alleged facts that, viewed in the light most favorable to him, would allow a reasonable juror to find that Janczyk (the arresting officer) violated Dormu's right under the Fourth Amendment to be free of excessive force. A reasonable juror could find that Janczyk violated Dormu's constitutional right because the circumstances surrounding Dormu's arrest were quite benign. In particular, Dormu was not arrested for any violent crime and Dormu did not resist arrest." Id. at 23. (parenthesis added).

Plaintiff submits that this case presents an almost identical  set of circumstances to that in *Dormu.*  Plaintiff was arrested for a very minor offense.  She alleges that she did not resist arrest – an allegation that the arresting officer concedes is correct.  She alleges she complained about the tightness of the handcuffs – complaints which she says were ignored by the defendant.  She has also presented evidence, which must be credited at this point that she has suffered a nerve injury to her wrist. A claim which is supported by a neurologist, Dr. Batipps.  While *Dormu,* is not controlling precedent for this Court, Plaintiff submits that it is well reasoned and correctly decided.

**B.** **The Right to Free of Such Violation was Clearly Established At the time Of Plaintiff's Arrest**

The right to be free from such a constitutional violation was clearly established at the time of this incident.  The Court in *Dormu,* stated that: "Almost every Court of Appeals has held that overly tight handcuffing can constitute excessive force, where the handcuffing has resulted in injury or where an individual complains about the overly-tight cuffing."  Id. at 23.

The following cases are instructive: *See, e.g., Howard v. Kansas City Police Dep't,* 570 F.3d 984, 991 (8th Cir.2009) (finding it clearly established that the Fourth Amendment prohibited officers from unreasonably ignoring complaints that unduly tight handcuffs were causing more than minor injury); *Lyons v. City of Xenia,* 417 F.3d 565, 575–76 (6th Cir.2005) (holding that the Fourth Amendment bars too-tight handcuffing where a plaintiff demonstrates some physical injury from the handcuffing and officers ignored complaints); *Wall v. County of Orange,* 364 F.3d 1107, 1112 (9th Cir.2004) ("It is well-established that overly tight handcuffing can constitute excessive force."); *Kopec v. Tate,* 361 F.3d 772, 774 (3d Cir.2004) (reversing summary judgment for defendant where handcuffs caused plaintiff extreme pain and permanent nerve damages); *Payne v. Pauley,* 337 F.3d 767 (7th Cir.2003) (finding summary judgment for defendant inappropriate where plaintiff complained of too-tight handcuffs); *Mickle v. Morin,* 297 F.3d 114, 120 (2d Cir.2002) (holding reasonable juror could find use of excessive force where plaintiff alleged she was injured from too-tight handcuffs); *Bastien v. Goddard,* 279 F.3d 10, 12 (1st Cir.2002) (reviving excessive force claim where plaintiff repeatedly complained that handcuffs had been applied too tightly and was diagnosed with injury); *Heitschmidt v. City of Houston,* 161 F.3d 834, 839–40 (5th Cir.1998) (denying qualified immunity where plaintiff alleged overly tight handcuffs caused serious and permanent injury to his wrists and where he requested that the handcuffs be loosened). Thus, it was clearly established at the time of Plaintiff's arrest that she had the right to be free from injury-inflicting handcuffing where she complained about the tightness of the cuffs.

Plaintiff has therefore demonstrated that based on her allegations, a constitutional violation has been made out and that the right to be free from such violation was clearly

established at the time of the incident in this case. Defendant may not avail himself of the

defense of qualified immunity in this case.

Respectfully Submitted,

_/s/ Geoffrey D. Allen_
D.C. Bar 288142
1030 15th St. N.W.
Su. 555 W
Washington, DC  20036
(202) 778-1167 (o)
 (202) 659-9536 (f)
E- Mail: geoffreyallen@verizon.net

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DELPHINE TAYLOR                                    :
                                                   :
    Plaintiff,                 :
                                                   :
vii.                                               :  CASE NO. 17-123 RBW
                                                   :
                                                   :
JEREMY GUIDA                                       :
                                                   :
    Defendant.                 :

**OFFICER GUIDA'S STATEMENT OF MATERIAL
FACTS CONTRAVERTED BY PLAINTIFF**

1.    Defendant's Statement of Fact No.47.  Officer Guida places the handcuff on one wrist at a time checks for adequate room and slackness by both visually and physically inspecting the handcuffs.

   **Plaintiff:** To the extent this implies that Officer Guida physically moved the handcuffs on Plaintiff's wrists, this is specifically denied by Plaintiff. Plaintiff's Exhibit 3.

2.    Defendant's Statement of Fact No.48.    Visual inspection of the handcuffs entails Officer Guida looking to see if there are gaps on each side and physical inspection means he makes sure that the handcuffs can move along the wrist.

   **Plaintiff:**  Plaintiff specifically denies that Officer Guida ever moved the handcuffs along her wrists. Plaintiff's Exhibit 3.

3.    Defendant's Statement of Fact No.49.  The physical inspection can be moving the handcuffs back and forth from side to side or moving them up and down. (Guida Depo at 28:7-12).

   **Plaintiff:**  Plaintiff specifically denies that Officer Guida did this in her case.. Plaintiff's Exhibit 3.

4. Defendant's Statement of Fact No.50. After conducting both visual and physical inspections of the handcuffs, Officer Guida then double-locks the handcuffs.

**Plaintiff:** Plaintiff asserts that she never felt the Officer who placed the handcuffs on her move them up and down her wrist or move them from side to side after they were placed on her. Plaintiff's Exhibit 3.

5. Defendant's Statement of Fact No. 52. Guida testified that Plaintiff never told him that the handcuffs were too tight.

**Plaintiff:** While Plaintiff agrees this is what Officer Guida said in his deposition this is specifically contradicted by Plaintiff who claims that she complained that the handcuffs were too tight within a second or two of them being placed on her.. Plaintiff's Exhibit 2 (Taylor Deposition 113/19 -114/3)

6. Defendant's Statement of Fact No. 53: Officer Guida approached Plaintiff while waiting for transport and checked the handcuffs as he has described, by both visual inspection and physical inspection of moving the handcuffs along Plaintiff's wrists. He remembers bending over at the waist and determining that they were not too tight.

**Plaintiff :** Plaintiff claims that after she complained again about the handcuffs being too tight, while she was waiting for transport, no one checked the handcuffs to see if they were on too tight. Exhibit 3 (Affidavit of Delphine Taylor)

Respectfully Submitted,

_/s/ Geoffrey D. Allen_
D.C. Bar 288142
1030 15th St. N.W.
Su. 555 W
Washington, DC 20036
(202) 778-1167 (o)
(202) 659-9536 (f)
E- Mail:Geoffreyallen@verizon.net

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DELPHINE TAYLOR | : |
| | : |
|     Plaintiff, | : |
| | : |
| viii. | : CASE NO. 17-123 RBW |
| | : |
| | : |
| JEREMY GUIDA | : |
| | : |
|     Defendant. | : |

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS

1.   Jeremy Guida joined WMATA ("Metro") as a police officer when he was twenty three and has been continuously employed since then.  Exhibit 1 (Guida Deposition Tr. 8/15 -8/19).

2.   Officer Guida was on duty at the Gallery Place station during the evening on January 27, 2016. Exhibit 1 (Guida Deposition Tr. 9/13 -9/19).

3.   He saw Delphine Taylor approach the fare gate.  Exhibit 1 (Guida Deposition Tr. 14/1 -14/4).

4.   He observed her pass through the fare gate without paying. Exhibit 1 (Guida Deposition Tr. 15/7 -15/13).

5.   Officer Guida called out for her to stop.  She turned around.  He told her to go back through the fare gate. She complied.   Exhibit 1 (Guida Deposition Tr. 20/12 – 21/16).

6.   Officer Guida arrested her for fare evasion and placed her in handcuffs. Exhibit 1 (Guida Deposition Tr. 24/17 -26/20).

7.   Officer Guida testified in his deposition that Delphine Taylor did not resist being arrested. Exhibit 1 (Guida Deposition Tr. 38/17 – 39/5).

8. Delphine Taylor remained calm after her arrest. She was not thrashing around. Exhibit 1 (Guida Deposition Tr. 39/20- 41/14).

9. Officer Guida testified at his deposition that he could not recall what his handcuffing training consisted of. Exhibit 1 (Guida Deposition Tr. 54/14 – 54/16)

10. Delphine Taylor is an army veteran who served as a combat medic in Iraq and Afghanistan. Exhibit 2 (Taylor Deposition Tr. 10/2 – 11/18)

11. Delphine Taylor testified that she was arrested and placed in handcuffs for fare evasion by a Metro Police Officer. Upon being placed in handcuffs she complained that they were too tight. The Officer refused to loosen them. Exhibit 2 (Taylor Deposition Tr. 78/14 – 79/13)

12. She is not sure who placed the handcuffs on her because her back was to the officers. Exhibit 2 (Taylor Deposition Tr. 78/14 – 79/13)

13. Delphine Taylor complained again of overtight handcuffs while she was waiting for the transport vehicle but again they were not loosened. Exhibit 2 (Taylor Deposition Tr. 118/7 – 118/9)

14. No one attempted to move the handcuffs up and down her wrist or from side to side after they were placed on her . Exhibit 3 (Affidavit of Delphine Taylor)

15. Over the course of a long career in law enforcement, Randy Foster has served as a police officer and detective in North Carolina, a US Air Force Police officer, an Air Marshall and a US Marshall. Exhibit 4 (Resume of Randy Foster)

16. Mr. Foster has opined that the national standard of care for handcuffing requires that the tip of the index finger should be inserted between the handcuff and the wrist on the top, bottom and sides. Exhibit 5 (Report of Randy Foster)

17. Mr. Foster opined that this is the method used by the US Marshalls Service, the Air Marshalls Service and all other police organizations that he has been a part of. Exhibit 5 (Report of Randy Foster)

18. Mr. Foster also relied on an excerpt from a book titled "Tactical Handcuffing" by John G. Peters. Exhibit 5 (Report of Randy Foster);

19. On page 70 the author of that book states: "Generally speaking, after you have applied the handcuffs you should be able to slip the tip of your index finger under the handcuffs, on the top, bottom and sides" Exhibit 6 ( Excerpt from book by John G. Peters)

20. On the same page is an illustration showing a person inserting their index finger between the bracelet part of the handcuff and the wrist of the person who is handcuffed. Exhibit 6 ( Excerpt from book by John G. Peters)

21. Mr. Foster also relies on a DC Metropolitan Police training lesson plan which also states that the correct test is to insert the index finger on the top bottom and sides of the wrist. Exhibit 7 (Lesson Plan)

22. Mr. Foster opined that the "fingertip" test is the national standard of care which was not complied with by Officer Guida when he  applied the handcuffs, because Guida admitted he did not do this test. Exhibit 5 (Report of Randy Foster)

23. Mr. Foster also opined that assuming Delphine Taylor did complain immediately about over tightness then  Officer Guida violated the national standard of care when he failed to loosen them.   Exhibit 5 (Report of Randy Foster).

24. Mr. Foster also opined that Officer Guida also violated the national standard of care when he failed to adjust the handcuff after Delphine Taylor complained  about the handcuffs being overtight while she was waiting for transport to a Police station. Exhibit 5 (Report of Randy Foster)

25. Mr. Foster also opined that even if there was some movement of the handcuffs along the wrist, this would not in his opinion comply with the standard of care. Exhibit 9 (Foster Deposition Tr. 71/1-71/7)

26. Mr. Foster stated that in his opinion there could be movement of the handcuff along the wrist and that the handcuffs could still be too tight and cause injury to the person who was handcuffed. Exhibit 9 (Foster Deposition Tr. 32/23 – 33/5)

27. Mr. Foster stated that this opinion is based on over twenty years experience of handcuffing supervising others who handcuffed people.

28. Mr. Foster's experience encompasses handcuffing people in a variety of contexts including "on the street" as a detective and as a U.S. Marshall arresting fugitives and parole violators. Exhibit 9 (Foster Deposition Tr. 23/10-24/12)

29. Delphine Taylor was seen by Dr. Michael E. Batipps, a board certified neurologist on October 3, 2016 at which time examination revealed tenderness on the dorsum of the right hand and a small tender nodule on her hand. Exhibit 8 (10/3/16 Medical Report of Dr. Batipps).

30. Dr. Batipps diagnosis was injury to the superficial radial nerves of both hands, right greater than left, caused by tight handcuffs. Exhibit 8 (10/3/18 Medical Report of Dr. Batipps).

31. Dr Batipps opined that: " It is well known that tight handcuffs can cause injury to the superficial sensory branch of the radial nerve as it goes across the metacarpal bones of the dorsum of the hand. The superficial branch off the radial nerve courses across the bony structures of the dorsum of the right hand and lies just beneath the surface of the skin it is therefore vulnerable to impingement at this point on the dorsum of the hand." Exhibit 8 (10/3/18 Medical Report of Dr. Batipps).

32. Dr. Batipps also stated: "The patient also has some injury to the extensore digitorum communis tendons on the dorsum of the right hand, certainly due to same process of tight handcuffs on the dorsum of the right hand,  where the extensor digitorum communis tendons are in close proximity to the metacarpal bones.  There is a palpable tender nodule at that point." Exhibit 8 (10/3/18 Medical Report of Dr. Batipps).

Respectfully Submitted,

*/s/ Geoffrey D. Allen*
D.C. Bar 288142
1030 15th St. N.W.
Su. 555 W
Washington, DC  20036
(202) 778-1167 (o)
 (202) 659-9536 (f)
E- Mail:Geoffreyallen@verizon.net

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DELPHINE TAYLOR                  :
                                            :

       Plaintiff,                  :

v.                                    : CASE NO. 17-00123 RBW
                                            :

WASHINGTON METROPOLITAN     :
AREA TRANSIT AUTHORITY, et al.    :
                                            :
                                            :

       Defendants.             :


## <u>ORDER</u>


UPON CONSIDERATION OF Defendant Guida's motion for summary judgment, any

opposition thereto, , it is this__day of_____ hereby,

ORDERED, that Defendant's Motion is hereby DENIED.


                                    _____
                                    JUDGE, U.S. DISTRICT COURT


Copies to:

Geoffrey Allen
Janice Cole